## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

SONJA L. GREAR,

      **Plaintiff,**

      **v.**
                           **Case No. 15-7458-JAR**

MILLER & NEWBERG, INC.,

      **Defendant.**

## MEMORANDUM AND ORDER

Plaintiff Sonja L. Grear brought this action against Defendant Miller & Newberg, Inc. ("MNI"), asserting claims of discriminatory termination, failure to accommodate her disability, retaliation, and harassment, pursuant to the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA").  On November 17, 2015, the Court entered an Order dismissing Plaintiff's harassment claim and limiting her failure to accommodate claim to the time frame leading up to her receipt of her requested accommodation, and not thereafter (Doc. 35).  This matter is before the Court on Defendant's Motion for Summary Judgment (Doc. 40).  The motion is fully briefed and the Court is prepared to rule.  For the reasons stated below, the Court grants Defendant's motion.

## I.      SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the moving party demonstrates "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."[1] In applying this standard, the Court views the evidence and all reasonable inferences therefrom

---

[1]Fed. R. Civ. P. 56(a).

in the light most favorable to the nonmoving party.[2]  "There is no genuine [dispute] of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party."[3]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[4]  A dispute of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[5]

The moving party initially must show the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law.[6]  In attempting to meet this standard, a movant who does not bear the ultimate burden of persuasion at trial need not negate the nonmovant's claim; rather, the movant need simply point out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim.[7]

Once the movant has met the initial burden of showing the absence of a genuine dispute of material fact, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[8]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[9]  Rather, the nonmoving party must "set forth specific facts that would be

---

[2]*City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[3]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986)).

[4]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[5]*Adler,* 144 F.3d at 670 (citing *Anderson,* 477 U.S. at 248).

[6]*Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002), *cert. denied* 537 U.S. 816 (2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[7]*Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler,* 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[8]*Anderson,* 477 U.S. at 256; *Celotex,* 477 U.S. at 324; *Spaulding,* 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).

[9]*Anderson,* 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.,* 256 F.3d 1013, 1017 (10th Cir. 2001).

admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[10]  In setting forward these specific facts, the nonmovant must identify the facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[11]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[12]

## II.    UNCONTROVERTED FACTS

The following material facts are uncontroverted, stipulated to for the purposes of summary judgment, or viewed in the light most favorable to Plaintiff.

Plaintiff Sonja Grear worked as an Actuarial Analyst for Defendant MNI from May 1998 until her termination on March 5, 2015.  Pursuant to MNI's Personnel Handbook ("Handbook") from April 2013, a part-time employee is an employee who regularly works less than 31 hours per week and does not receive paid time off.  Plaintiff generally did not work more than 30 hours per week and understood she was a part-time employee.  MNI does not have a progressive discipline policy and may dismiss an employee with or without cause at any time.  Additionally, the Handbook requires employees to be in the office to work with co-workers and be available to clients during its "core hours," from 10:00 a.m. to 4:00 p.m.  MNI infrequently allows exceptions to this requirement.  As of 2013, Plaintiff knew that being present during core hours was an important component of her employment.  However, Plaintiff had difficulty arriving at work before 10:00 a.m. because she needed extra sleep.

---

[10]*Mitchell v. City of Moore, Okla.,* 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler,* 144 F.3d at 670–71); *see Kannady,* 590 F.3d at 1169.

[11]*Adler*, 144 at 671.

[12]*Celotex,* 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

Plaintiff emailed Eric and Lori Newberg, MNI's owners, on April 16, 2014, requesting to be placed on salary at a wage equal to 30 hours per week and to arrive between 11:00 a.m. and noon.  In her email Plaintiff informed Mr. and Ms. Newberg that she suffered from depression, and that her difficulty arriving by 10:00 a.m. stemmed from her need to get adequate sleep. Plaintiff further explained that sleep deprivation could trigger her depressive episodes.  Mr. Newberg had been aware since early 2013 that Plaintiff had prior thoughts of suicide.  In response to Plaintiff's request, Mr. Newberg sent Plaintiff an email informing her that in an effort to provide appropriate accommodations, Plaintiff would need to schedule an appointment with a health care provider of MNI's choosing, who would substantiate Plaintiff's impairment and provide options for reasonable accommodations.  Mr. Newberg also noted that MNI would pay for all costs for the evaluation.  Plaintiff agreed to the evaluation.

On April 22, 2014, Plaintiff emailed Mr. and Ms. Newberg to withdraw her accommodation request she sent on April 16.  On April 23, 2014, Plaintiff met with Mr. and Ms. Newberg to discuss her accommodation request.  The following day, Plaintiff emailed Mr. and Ms. Newberg noting that she would try to be in the office by no later than 11:30 a.m.

Mr. and Ms. Newberg originally scheduled to meet with Plaintiff to discuss her request to receive a salary on July 23, but Mr. Newberg postponed the meeting until July 24 because Ms. Newberg had to go out of town.  Mr. Newberg recalled Plaintiff being very upset and angry that that the meeting could not be held that day.  Plaintiff met with Mr. and Ms. Newberg on July 24, 2014 to discuss Plaintiff's salary request.  At that time, Mr. and Ms. Newberg informed Plaintiff that they would not place her on salary because she had not complied with her requested 11:30 a.m. arrival time.  Mr. and Ms. Newberg noted that Plaintiff was very upset and angry about the decision to deny her salary request and left the meeting enraged.  After this meeting, Ms.

Newberg recalled receiving "a lot of hostility, and a lot of disrespectful comments" from Plaintiff.  Mr. Newberg felt threatened by several emails that Plaintiff sent after the July 24 meeting, including one in which she stated that she was considering filing an ADA claim against the company.

Following July 24, 2014, Plaintiff continued to arrive later than the 11:30 a.m. requested arrival time; generally around mid to late afternoon.  The log-in times on Plaintiff's computer revealed that between December 22, 2014 to March 4, 2015, Plaintiff arrived at work by 11:30 a.m. only six or seven times.  During the third and fourth quarter of 2014 as well as the period after December 22, 2014, Plaintiff arrived between 1:12 p.m. and 6:00 p.m. several times. After the July 24, 2014 meeting, Mr. Newberg discussed his concerns about the integrity of MNI's network server with Ms. Newberg and Carolyn Covington.  Mr. Newberg was concerned that Plaintiff was a disgruntled employee, who posed a serious risk to MNI's data.  Because of these concerns, Mr. Newberg considered removing Plaintiff's passkey.  Passkeys are needed to enter MNI's building between 5:30 p.m. and 7:30 a.m. during the week and for any time during the weekend, but are not needed to exit the building.  MNI deactivated Plaintiff's passkey on August 8, 2015, and ultimately deactivated all part-time employees' passkeys.  Mr. Newberg did not notify Plaintiff about this deactivation for several weeks because, given his knowledge of her prior suicidal thoughts, he was concerned such notice would agitate her.  MNI provided Plaintiff access to MNI's office on weekends upon request.

On June 26, 2014, Plaintiff received a doctor's letter noting that because of her medical condition, she required special accommodation at work: not starting work before 11:30 a.m. and having a quiet work environment, preferably an office of her own.  Plaintiff delivered the letter to MNI on or about June 26, 2014.  In response to the doctor's letter, Mr. Newberg sent Plaintiff

a letter on August 7, 2014, again agreeing to the 11:30 a.m. arrival time so long as Plaintiff could complete her workday by 6:00 p.m. and perform her job responsibilities satisfactorily.

Mr. Newberg's response letter from August 7, 2014 also stated that MNI was unable to accommodate Plaintiff's request for her own office because an office was not normally provided to other employees at her job level and because the open offices were expected to be occupied in the near future.  Plaintiff, along with three other employees, had moved from an office into a cubicle in 2013 when MNI replaced offices with cubicles.  MNI noted in the letter that Plaintiff occupied a high-walled cubicle in a typically quiet area without machinery or other noise sources.  On August 8, 2014, Plaintiff emailed Mr. Newberg informing him that the doctor said she needed a quiet work environment and MNI's only reason for denying her request was to prove that accommodation presented an undue hardship under the ADA.   On August 8, 2014, MNI informed Plaintiff that she would receive a private office.  After this day, Plaintiff agrees MNI provided her with reasonable accommodations.[13]  MNI arranged to relocate Plaintiff to the interior, private office adjacent to her current cubicle, and Plaintiff moved into this office after September 2, 2014, when she returned to work after release from an outpatient treatment program.

Around August 5, 2014, Plaintiff told MNI's Business Director, Kristen Carlson, that she attempted to admit herself into an inpatient treatment program for her suicidal thoughts, but that they would not admit her, so she planned to remain at home until she could enter an outpatient program in about a week.  Plaintiff requested Ms. Carlson inform Mr. and Ms. Newberg about this as well.  Ms. Carlson emailed Mr. and Ms. Newberg accordingly.  After Mr. Newberg received an email from Ms. Carlson, he called Plaintiff on August 5, 2014, telling her that taking

---

[13]Doc. 41 at 15.

care of her life and health is more important than being at work so she should get the help needed, and MNI would pay for the next three days.  MNI gave Plaintiff a leave of absence to attend this treatment and paid Plaintiff for three days of her three-week medical leave for the outpatient treatment.

MNI's Director of Quality Control, Nancy Wunderlich, had several concerning conversations with Plaintiff but did not report any of the conversations because she thought other people knew and she did not want to alter others' opinions of Plaintiff.  Sometime between 2006 and 2008, Plaintiff told Ms. Wunderlich that she planned to buy land in Maine to use as a potato farm, build a bunker, arm herself, and shoot people who tried to steal her potatoes.  Plaintiff also asked Ms. Wunderlich if she knew where Plaintiff could obtain body armor for her infant. Sometime before March 3, 2015, Ms. Wunderlich recalled another conversation in which Plaintiff made inappropriate comments about management and called Ms. Newberg evil.[14]

Ms. Wunderlich and Plaintiff had a conversation on March 3, 2015 in Wunderlich's office, in which Ms. Wunderlich recalled Plaintiff as very animated, tensed up, pointing vehemently, and at a level of anger she had not seen before.  Plaintiff told Ms. Wunderlich that "thinking about killing them" is what brought Plaintiff out of her depression.[15]  Although Ms. Wunderlich does not recall Plaintiff making an express threat to kill any member of MNI management, Ms. Wunderlich believed Plaintiff's comments to be a credible threat and reported

---

[14]*Id.* at 20–21.

[15]Ms. Wunderlich also testified in her deposition to other statements by Plaintiff during the conversation in which she referred to "killing them" or "killing someone."  *See* Doc. 41 at 21.  Plaintiff's deposition testimony regarding this conversation was inconsistent.  She testified that she used the word "kill" or "killing" maybe once or not at all during the conversation, but also testified that if Ms. Wunderlich "remembered that I said 'want to kill,' I mean, it's more likely than not that's what I said, but I don't remember."  *See* Doc. 44-1 at 108.  Plaintiff also alleged in her Complaint that "I may have mentioned thinking about wanting to harm some members of management, but the context should have made it clear that any desire was in the past and that I never had any intention to harm anyone."  Doc. 1 at 7.  Based on the foregoing, the Court finds uncontroverted the fact that Plaintiff referred at least once to "thinking about killing them."

the conversation the next day on March 4, 2015.  MNI's management did not contact Plaintiff to hear her side of the situation.

On March 4, 2015, Ms. Wunderlich met with Ms. Carlson to discuss her concerns, and sought advice following the conversation she had with Plaintiff the previous day.  Ms. Wunderlich also met with Mr. and Ms. Newberg twice on March 4, 2015 to tell them about the conversation with Plaintiff the previous day and previous concerning conversations.  Ms. Wunderlich informed them that Plaintiff had angry and violent wishes for management, including that she had thoughts of killing management.[16]  Mr. and Ms. Newberg were both shocked and frightened.  Ms. Covington and Mr. and Ms. Newberg were all concerned and worried about the safety of MNI's office because they were scared Plaintiff was going to act on her thoughts.  MNI reported Ms. Wunderlich's conversation with Plaintiff to the Overland Park Police Department on March 4, 2015.  The police officer told Mr. Newberg not to confront Plaintiff, suggested MNI terminate Plaintiff via email instead of in the office where there could be a scene, and not allow Plaintiff entry into the office.  MNI dismissed Plaintiff on March 5, 2015.  Plaintiff alleged in a complaint to the Equal Employment Opportunity Commission ("EEOC") that MNI probably dismissed her because of her March 3 conversation with Wunderlich.

## III.    DISCUSSION

### A.    Discriminatory Termination

Plaintiff asserts that Defendant engaged in discrimination under the ADA when it terminated her employment based on her depression.  The ADA prohibits "discriminat[ion]

---

[16]Doc. 44 at 7.

against a qualified individual on the basis of disability."[17]  The familiar *McDonnell Douglas* burden-shifting framework applies to ADA discrimination claims.[18]  Pursuant to this evidentiary framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination.[19]  If she makes this showing, the burden then shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for its actions.[20]  The burden then shifts back to the plaintiff to show that the defendant's proffered reason is in fact a pretext designed to mask discrimination.[21]  Because the parties do not dispute that Defendant has proffered a nondiscriminatory reason for termination, the Court turns to whether Plaintiff has established a prima facie case and presented evidence of pretext.

### 1.  Prima Facie Case

To establish a prima facie case of discrimination under the ADA, a plaintiff must present evidence that (1) she is disabled within the meaning of the ADA; (2) she is qualified to perform the essential functions of her job with or without accommodations; and (3) she was terminated under circumstances that give rise to an inference that the termination was based on her disability.[22]  The burden to establish a prima facie case is "not onerous," and establishment of the prima facie case "in effect creates a presumption that the employer unlawfully discriminated against the employee."[23]  Here, Defendant does not dispute that Plaintiff's depression qualifies as

---

[17]42 U.S.C. § 12112(a).

[18]*Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1141 (10th Cir. 2011) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)); *Den Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1085 (10th Cir. 1997).

[19]*Carter*, 662 F.3d at 1141 (citing *McDonnell Douglas*, 411 U.S. at 802).

[20]*Id.*

[21]*Id.*

[22]*Smothers v. Solvay Chem., Inc.*, 740 F.3d 530 544 (10th Cir. 2014); *Carter*, 662 F.3d at 1142 (stating third element as showing that plaintiff "was fired because of his disability").

[23]*Id.*; *Tesh v. U.S. Postal Serv.*, 349 F.3d 1270, 1272 (10th Cir. 2003) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)).

a disability under the ADA.  The Court therefore begins by analyzing whether Plaintiff was

qualified to perform the essential functions of her job.

To determine whether an employee is qualified—with or without reasonable

accommodation—to perform the essential functions of the job, courts employ a two-fold

inquiry.[24]  "First, the court determines whether the individual can perform the essential functions

of the job. Second, if (but only if) the court concludes that the individual is unable to perform the

essential functions of the job, the court determines whether any reasonable accommodation by

the employer would enable [her] to perform those functions."[25]  In determining the essential

functions of the job, courts should not second guess the employer's judgment when its

description of "any necessary job specification is job-related, uniformly enforced, and consistent

with business necessity."[26]

Defendant first argues that Plaintiff was not qualified to perform her job based on the

conversation she had with Ms. Wunderlich.  In *Mayo v. PCC Structurals Inc.*, the Ninth Circuit

held that an employee who threatened to kill fellow employees was not qualified to perform his

job, regardless of whether the threats stemmed from his major depressive disorder.[27]  The court

explained its reasoning as follows:

> An essential function of almost every job is the ability to appropriately handle
> stress and interact with others.  And while an employee can be qualified despite
> adverse reactions to stress, he is not qualified when that stress leads him to
> threaten to kill his co-workers in chilling detail and on multiple occasions (here, at
> least five times).  This vastly disproportionate reaction demonstrated that [the
> employee] could not perform an "essential function of his job, and was not a
> "qualified individual." This is true regardless of whether [the employee]'s threats
> stemmed from his major depressive disorder. . .

[24]*Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260, 1267 (10th Cir. 2015) (citing *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1190 (10th Cir. 2003)); *see also* 42 U.S.C. § 12111(8).

[25]*Osborne*, 798 F.3d at 1267.

[26]*Tate v. Farmland Indus., Inc.*, 268 F.3d 989, 993 (10th Cir. 2001) (citing *Davidson*, 337 F.3d at 1191).

[27]795 F.3d 941, 944–45 (9th Cir. 2015).

> An employee whose stress leads to serious and credible threats to kill his co-workers is not qualified to work for the employer, regardless of why he makes those threats.  We have not located any cases, regulations, or guidance that disagree with this common sense principle.[28]

As the court in *Mayo* recognized, other courts have also held that employees who threaten co-workers or otherwise pose a potential threat of violence to their workplace are not qualified to perform the essential functions of their jobs.[29]  Here, it is undisputed that Plaintiff expressed her feelings about "killing them" at least once to Wunderlich.  Based on this conversation, management at MNI felt that the workplace was threatened to the point that they consulted with the local police.  Like in *Mayo* and the other cases described above, Plaintiff's communication of violent thoughts to another employee threatened the safety of co-workers and the workplace, thereby disqualifying her from performing the essential functions of her job.

Plaintiff attempts to distinguish *Mayo* on the basis that unlike the employee in that case, Plaintiff's communications were not an expression of a "credible, detailed, and unwavering plan to kill [her] supervisors."  Further, Plaintiff argues that she "is not alleged to have made any specific threats to kill any specific owner or employee of defendant," and that she simply expressed that "the mere thought of [killing them] lessened her depression."[30]  These distinctions are not meaningful for the analysis of whether Plaintiff was qualified to perform the essential

---

[28]*Id.*

[29]*See Palmer v. Circuit Ct. of Cook Cnty., Ill.*, 117 F.3d 351, 352 (7th Cir. 1997) ("The [ADA] does not require an employer to retain a potentially violent employee . . . The Act protects only 'qualified' employees, that is, employees qualified to do the job for which they were hired; and threatening other employees disqualifies one"); *Calef v. Gillette Co.*, 322 F.3d 75, 87 (1st Cir. 2003) ("Put simply, the ADA does not require that an employee whose unacceptable behavior threatens the safety of others be retained, even if the behavior stems from a mental disability. Such an employee is not qualified."); *Green v. Burton Rubber Processing, Inc.*, 30 F. App'x 466, 470 (6th Cir. 2002) (holding that employee disqualified himself "from any protection under the ADA" when he informed his wife, his therapist, his physician, and hospital personnel that he had thoughts of killing his supervisors); *Valentine v. Standard & Poor's*, 50 F. Supp. 2d 262, 288–89 (S.D.N.Y. 1999), *aff'd*, 205 F.3d 1327 (2d Cir. 2000) (holding that employee who threatened reputation of fellow employee was not qualified to perform his job under ADA).

[30]Doc. 44 at 9.

functions of her job.  Plaintiff's thoughts may not have been as developed or specific as those of the employee in *Mayo*.  But the Court declines to find that Plaintiff was qualified simply because she did not expressly state that she had a concrete plan to kill members of management.  Here, Plaintiff communicated her thoughts about "killing them" to Wunderlich, and her communications frightened MNI management and raised concerns about workplace safety. Under these circumstances, the Court finds that Plaintiff was not qualified to perform the essential functions of her job.

Defendant also argues that Plaintiff was not qualified because of her attendance issues. Physical attendance in the workplace is generally an essential function of most jobs.[31] Additionally, courts will not second guess an employer's judgment as to what functions are essential.[32]  Here, Defendant required its employees to be present at work during the "core hours" of 10:00 a.m. to 4:00 p.m., so that they could work with co-workers and be available to clients.  Regular attendance was therefore an essential function of Plaintiff's job.  Defendants accommodated Plaintiff by allowing her to begin her workday at 11:30 a.m., rather than 10:00 a.m.  But Plaintiff still rarely made it in to work by this time, and she arrived after 1:00 p.m. on several occasions.  Thus, Plaintiff's undisputed attendance record demonstrates that that she was unqualified to perform the essential functions of her job, even with reasonable accommodations.

Plaintiff argues that her attendance issues cannot be scrutinized in determining whether she was qualified to perform her job because she was never told that her attendance was at a

---

[31]*Valdez v. McGill*, 462 F. App'x 814, 817 (10th Cir. 2012) (quoting *Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1119 (10th Cir. 2004)); *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134 (10th Cir. 2011) (explaining that regular attendance is an essential function of some jobs); *see also Taylor-Novotny v. Health Alliance Med. Plans, Inc.*, 772 F.3d 478, 489–90 (7th Cir. 2014) (concluding that "a plaintiff whose disability prevents her from coming to work regularly cannot perform the essential functions of her job, and thus cannot be a qualified individuals for ADA purposes").

[32]*Tate v. Farmland Indus., Inc.*, 268 F.3d 989, 993 (10th Cir. 2001) (citing *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1191 (10th Cir. 2003)).

point where she would be terminated, and Defendant did not cite her attendance as a relevant factor when it terminated her.[33]   However, Plaintiff was on notice that her attendance was a problem, as evidenced by Mr. and Ms. Newberg's refusal to make Plaintiff a salaried employee on account of her failure to regularly attend work by 11:30.   Further, although Defendant may have terminated Plaintiff primarily because of concerns for workplace safety, this does not mean that her attendance issues were not a factor in her termination.   In any event, Defendant's reasons for terminating Plaintiff relate to the second prong of the *McDonnell Douglas* framework, that is, whether Defendant has proffered a legitimate, non-discriminatory reason for Plaintiff's termination.   By contrast, the first prong of the prima facie case is concerned with whether Plaintiff was a qualified employee, regardless of the stated reasons for her termination.[34]   Here, Plaintiff was not qualified to perform the essential functions of her job because she could not meet the requirement of regular and timely attendance at work, even with reasonable accommodations.   Accordingly, the Court grants summary judgment on Plaintiff's discriminatory termination claim.

### 2.      Pretext

Although the Court grants summary judgment because Plaintiff cannot establish a prima facie case, the Court also finds that there is no genuine dispute of fact as to whether Defendant's stated reason for Plaintiff's termination was pretextual.   At the outset, the Court notes that in determining whether the proffered employment decision was pretextual, courts examine the facts as they appear to the person making the decision.[35]   Courts do not look to the plaintiff's

---

[33]Doc. 44 at 10.

[34]*See Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260, 1267 (10th Cir. 2015) (citing *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1190 (10th Cir. 2003)).

[35]*E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1044 (10th Cir. 2011); *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir. 2000).

subjective evaluation of the situation.[36]  Defendant states that it terminated Plaintiff because her expression of thoughts of "killing them" caused concerns for workplace safety.[37]  Plaintiff advances three arguments for why this reason was pretextual.

First, Plaintiff argues that Defendant's knowledge of Plaintiff's depressive condition indicates that the condition was a "determining factor" in Defendant's termination decision.[38] But Defendant's awareness of Plaintiff's condition does not alone give rise to an inference of pretext.  Plaintiff provides no evidence, beyond this awareness, that Defendant made its decision based on anything other than a concern for workplace safety.

Second, Plaintiff argues that Defendant treated Plaintiff inconsistently with regard to her depressive condition.  Defendant ordered a mental examination of Plaintiff in 2014 and provided her with a work schedule accommodation soon thereafter, but Defendant did not provide Plaintiff an accommodation or speak with her after the March 3, 2015 incident.[39]  This difference in treatment does not create a genuine dispute of fact as to pretext.  Defendant's grant of an accommodation in 2014 was in response to Plaintiff's legitimate request for an exception to the 10:00 a.m. attendance rule.  Plaintiff's communication of her thoughts of "killing them" to Ms. Wunderlich was not a request for an accommodation.  Instead, Defendant viewed Plaintiff's communications as a threat to workplace safety.  Defendant was not required to accommodate such a threat under the ADA.  Therefore, the Court finds that Plaintiff's evidence does not give rise to an inference of pretext.

---

[36]*C.R. England*, 644 F.3d at 1044.

[37]Doc. 41 at 1; *see* Doc. 44 at 10.

[38]Doc. 44 at 12–13.

[39]*Id.* at 13–14.

Finally, Plaintiff argues that Defendant's termination was pretextual because Plaintiff's conduct "was not, in fact, harmful to anyone."  According to Plaintiff, her communication to Plaintiff of her thoughts of "killing them" "was the mere recitation of a daydream."[40]  With the benefit of hindsight, Plaintiff urges the Court to find that Defendant's proffered reason for termination was not legitimate because no one was ultimately physically harmed.  But this argument misses the mark, because in evaluating pretext, courts must examine the facts as they appeared to the person making the decision.[41]  At the time of the decision, Mr. and Ms. Newberg, as well as other members of MNI management and the Overland Park Police, viewed Plaintiff's comments as a threat to the safety of the workplace.  Although Plaintiff argues that her communication was the expression of a mere "daydream," Defendant perceived it as a very real threat.  The Court declines to impose on Defendant the requirement that it adopt a "wait and see" approach in the context of threats to workplace safety.  The fact that the perceived threat ultimately did not materialize to create physical harm does not give rise to an inference of pretext.  Accordingly, the Court finds that no genuine dispute of fact exists regarding whether Defendant's proffered reason for termination was pretextual, and grants Defendant's motion for summary judgment on Plaintiff's discrimination claim.[42]

## B.    Retaliation

Defendant seeks summary judgment on Plaintiff's retaliation claim, arguing that she has failed to establish a prima facie case or present evidence of pretext.  Where, as here, the plaintiff does not offer direct evidence of retaliation, courts analyze ADA retaliation claims under the

---

[40]Doc. 44 at 14.

[41]*C.R. England,* 644 F.3d at 1044; *Kendrick*, 220 F.3d at 1231.

[42]In her EEOC Complaint, Plaintiff referred to similarly situated employees who were treated more favorably than her.  *See* Doc. 41, Ex. 17 at 5–9.  However, Plaintiff did not present these allegations in her Complaint, and she does not contend in her response that different treatment of similarly situated employees constitutes evidence of pretext.  Therefore, the Court does not address these allegations.

*McDonnell Douglas* framework.[43]  Under this framework, the plaintiff must establish a prima facie case of retaliation.[44]  If the plaintiff meets this burden, the burden shifts to the defendant to assert a legitimate non-discriminatory reason for the adverse action.[45]  The burden then shifts back to the plaintiff to show that the defendant's proffered reason is a "pretext masking discriminatory animus."[46]

In order to establish a prima facie case of retaliation, a plaintiff must show: "(1) that he engaged in protected opposition to discrimination; (2) that a reasonable employee would have found the challenged action materially adverse; and (3) that a causal connection existed between the protected activity and the materially adverse action."[47]  In responding to Defendant's motion for summary judgment, Plaintiff argues that the relevant protected activity was her conversation with Ms. Wunderlich on March 3, 2015, and that the materially adverse action was her discharge on March 5, 2015.[48]  Plaintiff contends that the March 3 conversation constituted protected opposition because she and Ms. Wunderlich were discussing Plaintiff's depression as well as her strategies for coping with her depression.  Even assuming that this conversation was simply a discussion about depression and coping strategies, the mere discussion of an ADA-protected condition does not automatically convert the conversation into protected activity under the

---

[43]*Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1207–08 (10th Cir. 2007) (citing *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1178 (10th Cir. 1999)).

[44]*Id.*

[45]*Id.*

[46]*Id.*

[47]*Id.* at 1208; *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1264 (10th Cir. 2001) (*citing Anderson*, 181 F.3d at 1178).

[48]Doc. 44 at 14–15.  In its memorandum in support of summary judgment, Defendant discusses a variety of other potential protected activities and materially adverse actions.  Doc. 41 at 51–54.  Because Plaintiff does not assert that these other activities and actions support her retaliation claim, the Court confines its analysis to the March 3 conversation and the resulting March 5 discharge.

ADA.[49]  Here, there is no evidence that the conversation involved allegations of discrimination based on an ADA-protected condition, or a request for accommodation under the ADA.  Rather, Plaintiff and Ms. Wunderlich simply discussed the challenges of a shared medical condition, and Plaintiff made several—in her words, "awkward-sounding"—comments about her strategies for coping with depression.[50]  Without more, the Court finds that Plaintiff has not established a prima facie case of retaliation because she has not presented evidence demonstrating that she engaged in protected activity on March 3, 2015.

Even if Plaintiff could establish a prima facie case, the Court finds that Plaintiff has not met her burden in establishing evidence of pretext.  The Court has explained above why Plaintiff has not met her burden in establishing evidence of pretext in the context of her discriminatory termination claim.[51]  For these same reasons, the Court finds that Plaintiff has not met her burden in presenting evidence of pretext in support of her retaliation claim. Therefore, the Court grants summary judgment on Plaintiff's retaliation claim.

## C.        Failure to Accommodate

Finally, Defendant moves for summary judgment on Plaintiff's claim that Defendant did not provide her with reasonable accommodations under the ADA.  The uncontroverted facts establish that Plaintiff requested the following accommodations: (1) to arrive to work at 11:30 a.m. rather than 10:00 a.m.; (2) for a quiet environment—preferably an office of her own; and (3) for medical leave related to outpatient therapy for her depressive condition.  The uncontroverted

---

[49]*See Lenzen v. Workers Compensation Reinsurance Ass'n*, 705 F.3d 816 (8th Cir. 2013) (holding that reference to medical problems "was insufficient to convert [plaintiff]'s complaints about [supervisor]'s management style into ADA-protected activity"); *St. John v. Sirius Solutions LLLP*, 299 F. App'x 308, 309 (5th Cir. 2008) (concluding that plaintiff did not engage in ADA-protected activity by sending emails that mentioned a medical condition but did not complain of discrimination based on the condition).

[50]Doc. 44 at 15.

[51]*See supra*, Part III.A.2.

facts also demonstrate that Defendant provided her with each of these accommodations. Defendant allowed her to arrive at 11:30, and also granted Plaintiff medical leave for her outpatient therapy.  Defendant paid for three days of Plaintiff's medical leave.  And although Defendant initially hesitated to provide Plaintiff her own office because of limited space, Defendant eventually provided her with an office.  Plaintiff does not controvert these facts or argue in her response that Defendant failed to accommodate her.[52]  Therefore, the Court grants summary judgment on Plaintiff's failure to accommodate claim.

## IV.     CONCLUSION

Because Plaintiff cannot establish a prima facie case or present evidence of pretext regarding her discriminatory termination claim, the Court grants summary judgment as to this claim pursuant to the *McDonnell Douglas* framework.  Additionally, Plaintiff has not established a prima facie case or presented evidence of pretext regarding her retaliation claim.  Accordingly, the Court grants summary judgment on Plaintiff's retaliation claim.  Finally, because no genuine dispute of fact exists as to whether Defendant provided accommodations to Plaintiff in response to her requests, the Court grants summary judgment on Plaintiff's failure to accommodate claim.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant Miller & Newberg, Inc.'s Motion for Summary Judgment (Doc. 40) is **granted**.

**IT IS SO ORDERED.**

Dated: August 2, 2016

                                        S/ Julie A. Robinson
                                        JULIE A. ROBINSON
                                        UNITED STATES DISTRICT JUDGE

---

[52]*See generally* Doc. 44.